ELLA L. HARRIS, Appellee, v. D. J. EVANS et al., Appellants.

**TAXATION: Tax Deed—Erroneous but Nonmisleading Recital.** A tax deed will not be invalidated because of an erroneous but *nonmisleading* recital in the notice of tax sale and in subsequent proceedings, as to the particular year's taxes for which the sale is being made.

**MUNICIPAL CORPORATIONS:** Public Improvements—Double Special
2   **Assessment.** Whether a lot may be assessed for two separate im-
     provements, or whether the assessment is excessive and in excess
     of one fourth of the value of the lot, are objections which must be
     made when the assessments are proposed and on appeal therefrom.
     Such objections may not be interposed to the validity of a tax deed.

**TAXATION: Sale.** An entire lot may legally be sold for the *aggregate*
2   of two special assessments when there has been no sale for two years
     for want of bidders.

**LIFE ESTATES:** Taxes—Right to Acquire Deed. The holder of a life
4   estate is in duty bound to pay taxes on his estate; but if he fails
     to do so, a stranger to the title may, of course, in good faith acquire
     a valid tax deed.

**REFORMATION OF INSTRUMENTS:** Tax Deed—Mistake in re
5   **Amount of Land.** A tax deed issued, by mistake, for only a *part*
     of a lot, when in truth the *entire* lot was properly sold, will be so
     reformed as to convey the entire lot.

*Appeal from Marshall District Court.*—JAMES W. WILLETT,
Judge.

OCTOBER 19, 1923.

SUIT in equity, to establish ownership of an undivided one-
fourth interest in a certain town lot, and to recover the value
of the use of said lot, and to declare void two tax deeds to said
lot. The court found that plaintiff was the owner of a one-
fourth interest in said lot, and awarded her judgment for the
value thereof and for the use of said premises by defendants,
in the total amount of $1,000. Defendants Evans and Carlson
appeal. Plaintiff also appeals from so much of the decree as
awarded her a judgment for only $1,000, instead of judgment
for one fourth of the lot, with improvements placed thereon by
defendants.—*Affirmed on appeal of plaintiff; reversed on appeal
of defendants.*

  *E. N. Farber,* for appellants.

  *C. H. E. Boardman,* for appellee.

ARTHUR, J.—I. Mary A. Crampton was the owner of Lot
7, Block 3, Rice's Addition to the town of Marshalltown, Iowa.

On March 13, 1897, she died, testate, seized of said property. Her will, which was admitted to probate, devised a life estate in said lot to her son, Edwin C. Burgess, and provided that at his death said lot should be sold, and the proceeds distributed as follows:  One fourth to Jennie Burgess; one fourth jointly to Harry and Charles Burgess; one fourth to Amelia K. Bedell; and one fourth to Ella L. Harris, plaintiff in this action.  In 1903, D. J. Ferguson purchased the interests in said lot of all of the Crampton devisees except the one-fourth interest of appellee Ella L. Harris. The lot is a corner lot, 180 feet long and 60 feet wide, and is located .at the northeast corner of Church and Sixth Streets in the town of Marshalltown.  In the year 1903, these streets were paved, and this lot was assessed for the paving on both of these streets.  On the south 150 feet of the lot, there was laid an assessment for paving Church Street, of $218.25, made on December 28, 1903.  On February 1, 1904, there was an assessment made against the whole lot for pavement of Sixth Street, in the amount of $406.75.  On December 2, 1907, the whole lot was sold for the total amount of the paving assessments levied against it, and one W. J. Hayes, for the Barber Asphalt Paving Company, which constructed the pavement, bought the property at tax sale, and certificate of purchase was issued to him for the whole lot.  Hayes assigned the certificate to the Barber Asphalt Paving Company.  This certificate was sold and assigned by the Barber Asphalt Paving Company to defendant D. J. Evans, Evans paying therefor $1,255; and on January 3, 1911, the treasurer of Marshall County executed a tax deed to Evans for the south 150 feet only of said lot.  Afterwards, on March 6, 1915, the treasurer executed a tax deed to Evans of the north 30 feet of said lot, under tax sale for the general taxes on the property for the year 1910.  On May 7, 1914, Evans deeded the south 120 feet of this lot to Albert C. Carlson.

In October, 1915, Edwin G. Burgess, the life tenant under the will of Mary A. Crampton, died.  D. J. Ferguson had acquired all except the one-fourth interest of Ella L. Harris in the lot, and occupied the premises for about eight years, up to 1911.  After D. J. Evans received his tax deed of January, 1911, he went into possession of the property.  Afterwards,

Evans sold the south 120 feet of the lot to Albert C. Carlson. When this action was commenced, on October 12, 1916, Evans was in possession of the north 60 feet of the lot, and Carlson of the south 120 feet of the lot. The pleadings spread over 53 pages of the abstract, and are quite involved. It will be sufficient to briefly state the respective claims of the parties here, and we may more particularly refer to such claims when we come to consideration of the several issues involved.

II.   It is the claim of plaintiff that she is the owner of a one-fourth interest in the entire lot; that D. J. Evans is the owner of three fourths of the north 60 feet; that A. C. Carlson is the owner of three fourths of the south 120 feet of said lot. Plaintiff avers that the tax deeds issued to D. J. Evans on January 3, 1911, and March 6, 1915, are void; that no duty devolved upon her to pay assessments and taxes until her title vested, at the termination of the life tenancy in October, 1915; that it was the duty of the defendants Ferguson, Evans, and Carlson, as grantees, to pay the taxes for which the property was sold; and that it was particularly the duty of said defendants to pay said taxes because the contract by which Ferguson purchased the interest of the life tenant and the three-fourths interests of the remaindermen provided that Ferguson should pay said taxes; that the tax deed of January 3, 1911, is void on account of various irregularities in the tax sale proceedings on which the deed is based, which claimed irregularities we will later consider. Plaintiff further claims that the taxes involved were allowed to go unpaid and the property to be sold through fraud and collusion, designed to cheat the plaintiff out of her interest in the property.

Defendant D. J. Evans bottoms his title obtained to the lot on his two tax deeds, executed to him by the treasurer of Marshall County on January 3, 1911, and March 6, 1915, and also upon a conveyance from D. J. Ferguson and wife, dated December 16, 1916.

In a cross-petition, defendant Evans asks to have the tax deed of January 3, 1911, reformed so as to correspond with the certificate of purchase at tax sale, so as to convey the whole of said lot, instead of only the south 150 feet thereof.   Also, it is

pleaded that plaintiff's rights are barred by the statute of limitations.

Defendant Carlson claims under deed from D. J. Evans, and his pleadings and claims are identical with those of Evans.

Defendants Marshall County and A. M. Gause, treasurer of Marshall County, plead that the tax deed of January 3, 1911, was executed in pursuance of the sale of said Lot 7 on December 2, 1907, said sale being for the two paving assessments against said lot; and that, by mistake and oversight, the treasurer executed said deed for only the south 150 feet of said lot, whereas the sale had been of the whole lot, and the proceedings leading up to the execution of said tax deed had been for and covered the whole of said lot; and that said deed should have covered the whole of said lot. Said defendants disclaim any interest in the property.

Defendants D. J. and Marie Ferguson aver that they have sold all their interest to D. J. Evans, and disclaim any interest in the property.

The main issue may be briefly stated thus:

Plaintiff has a one-fourth interest in the lot in controversy, if the tax deeds under which defendants Evans and Carlson claim title are void. If the deeds are valid, plaintiff's interest in the property has been extinguished.

III. We will first consider plaintiff's claim that the tax deed of January 3, 1911, is illegal and void because of failure to comply with the requirements of the statutes in the proceedings leading up to the issuance of the deed.

This lot is located at the northeast corner of Church and Sixth Streets, extending its length 180 feet on Sixth Street and its width 60 feet on Church Street. Both streets bordering on the lot in question were paved in the year 1903, and the lot was assessed for paving on each one of these streets. On the south 150 feet of the lot there was levied an assessment for paving Church Street of $218.25, made on December 28, 1903. On February 1, 1904, there was an assessment made against the whole lot for paving on Sixth Street in the amount of $406.75. These paving assessments were certified to the treasurer's office December 31, 1904. Delinquent tax list was published in the fall of 1905, for tax sale to take place on December 4, 1905, for

delinquent taxes for 1904 and previous year. In the published tax list appeared the following:

"City of Marshalltown, special paving 1905, owner's name, Crampton, Mary, description of property, Rice's south 150 feet Lot 7, Block 3, tax $218.25. Interest and costs $46.66, total $264.91; and owner's name, Crampton, Mary A. (heirs). Description of property, Rice's Lot 7, Block 3, tax $406.75, interest and costs $78.99, total $485.74."

Delinquent tax list was published in the fall of 1906, for sale to take place December 3, 1906, containing the statement:

"General taxes, for 1905 and special taxes for 1906, also for previous years when so specified."

In said tax list appeared:

"City of Marshalltown, special paving. Owner's name, Crampton, Mary. Description of property, Rice's Lot 7, Block 3, tax $406.75, interest and costs, $152.88, total, $559.63. Owner's name, Crampton, Mary, description of property Rice's S. 150 feet Lot 7, Block 3. Tax, $218.25. Interest and costs, $81.21. Total, $299.46."

In the fall of 1907, delinquent tax list was published for sale to take place on December 2, 1907, in which appears:

"General taxes for 1906 and special taxes for 1907, also for previous years when so specified."

In said delinquent tax list so published appears specifications as follows:

"Special paving, owner's name, Mary A. Crampton (heirs). Description of property, Rice's Lot 7, Block 3, tax, $625. Interest and costs, $323.49, total, $948.49."

It will be observed that in the list for 1905, under "special paving 1905," were listed the south 150 feet of said lot, and also the whole lot, for two separate items of assessment. In the 1906 list, the same arrangement was followed. In the 1907 list, the whole lot was listed in one item. In 1905 and 1906, the property was offered for sale for each separate assessment, but no bids were received. At the sale of December 2, 1907, the whole lot was sold for the total paving tax assessed against it, in the amount of $948.49, to the Barber Asphalt Paving Company. On May 5, 1910, the certificate of purchase was sold by the Barber Asphalt Paving Company to defendant D. J. Evans, for

$1,255. On September 6, 1910, D. J. Evans, holder of the certificate of purchase of December 2, 1907, caused to be served notice of expiration on Ella L. Harris, D. J. Ferguson, and Marie Ferguson, his wife, notifying them that the lot in question had been sold "for the special paving taxes of 1906," and that a treasurer's deed would issue therefor, unless the property was redeemed within 90 days from the service of the notice. Notice of expiration was also served by publication on Ella L. Harris, D. J. Ferguson, and Marie Ferguson, and Mary A. Crampton, Edwin G. Burgess, Charles E. Burgess, Amelia K. Bedell, and Edward J. Burgess and Ella L. Harris, executors of the estate of Mary A. Crampton, and the Crampton heirs. No redemption having been made, on January 3, 1911, a treasurer's deed was executed to D. J. Evans for the south 150 feet of said lot. It will be remembered that the certificate of purchase held by Evans was for the whole lot. Evans demanded a deed for the entire lot, but the treasurer refused to issue a deed for the whole lot, and executed one for only the south 150 feet thereof. Afterwards, on March 16, 1915, Evans acquired another tax deed for the north 30 feet of said lot. Plaintiff claims that there were various defects in the assessments and sale of the property for the paving taxes. The assessment for the Church Street paving was against the south 150 feet of the lot. The assessment for the Sixth Street paving was against the whole lot. D. J. Ferguson, who had bought the interests of the Crampton heirs in the lot, except the interest of appellee Ella L. Harris, objected to the assessments for paving, but no appeal was taken from either assessment, and the property was sold for the full amount of the paving assessments at the third offering at tax sale in December, 1907. As before mentioned, the property had been offered at the sales of December, 1905 and 1906, and not sold, for want of bidders.

Plaintiff's contention, outside of the claimed fraud and collusion of Ferguson and Evans in allowing the property to be sold for the paving taxes, thus depriving plaintiff of her interest in the lot, is that the tax deed of 1911 is void because the advertisement, the notice of delinquent tax sale, the certificate of purchase issued, the expiration notice, and the tax deed, all specified that the lot

1. TAXATION: tax deed: erroneous but nonmisleading recital.

was sold for 1906 taxes, when the 1906 taxes were, in fact, paid. It does appear that the general tax on the lot for 1906 had been paid. The testimony of the county treasurer shows that the lot was sold December 2, 1907, for the special paving taxes; that, at the tax sales in 1905 and 1906, the property was offered for each separate assessment, and there were no bids; that the whole lot was sold in 1907 for the full amount of the two assessments, interest, and costs against it. The record discloses that plaintiff, Ella L. Harris, knew of the paving improvement at the time it was made, and knew of the assessments that were made for the paving improvement. After the notice for tax deed was given by Evans, she had several conversations with Ferguson about redemption of the property, and offered to sell her interest in the property to Ferguson for $300; and Ferguson offered to sell to her his interest in the property for what he had invested in it. Ferguson offered to let her have the property for what he had in it, and let her settle with the paving company. But appellee claimed—which was doubtless true—that she was not able to buy his interest in the property, and no bargain was made. The lot was sold at the tax sale of December 2, 1907. The notice of said tax sale stated that the sale was for ''general taxes of 1906 and special taxes for 1907, also for previous years when so specified.'' The tax list published contained the statement:

''Special paving. Owner's name, Mary A. Crampton (heirs). Description of property, Rice's Lot 7, Block 3. Tax, $625. Interest and costs, $323.49. Total, $948.49.''

The certificate of purchase at said sale recites that the purchaser paid the taxes, interest, and costs ''as below specified on the following described land and town lot for the year A. D. 1906, assessed to Mary A. Crampton (heirs). Description of property, special paving, Rice's Addition, Lot 7, Block 3. Year 1905. Consolidated $625; interest, $322.34; costs, $1.55; total $948.49.'' It recites, also, that W. J. Hayes, for the Barber Asphalt Paving Company, purchased the whole of said lot for $948.48, the whole amount of taxes, interest, and costs then due and remaining unpaid on said lot, that ''being the least amount bid for.''

The notice of expiration states that the lot ''was sold for

the special paving taxes of 1906. The treasurer's deed recites that the south 150 feet of Lot 7, Block 3, was subject to taxation for the years 1905 and 1906; that the taxes assessed upon said real estate for the years 1905 and 1906 were due and unpaid; and that the south 150 feet of said lot was sold for $948.49, being the whole amount of taxes, interest, and costs unpaid on said property. While it is true that the notice of tax sale of 1907, the certificate of purchase, the notice for tax deed, and the tax deed recite that the real estate was sold for 1906 taxes, it is clear that the property was offered for sale for the paving taxes in 1905 and 1906; and, there being no bidders therefor, said taxes were carried forward on the tax list for 1907, and the property was offered for sale and sold for such taxes at the December sale, 1907. While the taxes were mentioned as the taxes of 1906, it is evident from other recitations in the notice of tax sale that the statement ''for 1906 taxes'' referred to the pavement taxes carried forward on the tax list. We think that the statement was not misleading, and that the notice was sufficient. We find no fatal defects in the proceedings leading up to the tax deed. Code Section 1421 provides:

''No irregularity or informality in the advertisement shall affect the legality of the sale or the title to any real estate conveyed by the treasurer's deed under this chapter, and in all cases its provisions shall be sufficient notice to the owners of the sale thereof.''

See, also, *Shawler v. Johnson,* 52 Iowa 472; *Davis v. Magoun,* 109 Iowa 308.

Code Section 1444 provides that the treasurer's deed shall be presumptive evidence of certain facts and conclusive evidence of certain facts. The latter are that the manner in which the listing, assessment, levy, notice, and sale were conducted was in all respects as the law directed; that all the prerequisites of the law were complied with by all the officers who had any part in any transaction relating to or affecting the title conveyed or purporting to be conveyed by the deed. The conclusive portion of this section covers substantially every alleged defect in the tax deed that plaintiff complains of. The notice of expiration provided for by Code Section 1441 is to be served on the persons in possession, and also on the person in whose name the

land is taxed at the time the notice is in fact given; all of which was done in the instant case. *Smith v. Callanan,* 103 Iowa 218.

IV.   Plaintiff alleges that this corner lot could not be legally assessed for the two street improvements.   Undoubtedly, this corner lot was subject to assessment for the two street improvements.   *Durst v. City of Des Moines,* 164 Iowa 82; *Morrison v. Hershire,* 32 Iowa 271. Anyway, any objection on account of the two assessments against the corner lot would have to be raised on appeal to the district court.   Also, any objection to the amount of the assessment in excess of one fourth of the value of the lot would have to be raised in objections before the city council, and on appeal.   No appeal was taken from the action of the city council.   *Durst v. City of Des Moines,* 150 Iowa 370, and 164 Iowa 82; *Hansen v. City of Missouri Valley,* 178 Iowa 859.

*2. MUNICIPAL CORPORATIONS: public improvements: double special assessment.*

V.   It is insisted by plaintiff that the whole lot could not legally be sold for the aggregate of the two assessments.   As before mentioned, the property was twice advertised for sale for the separate assessments before it was advertised and sold for the aggregate assessments, and no sale resulted.   This contention is without merit.   Code Section 1425 provides:

*3. TAXATION: sale.*

"Each treasurer shall, on the day of the regular tax sale each year or any adjournment thereof, offer and sell at public sale, to the highest bidder, all real estate which remains liable to sale for delinquent taxes, and shall have previously been advertised and offered for two years or more and remained unsold for want of bidders, general notice of such sale being given at the same time and in the same manner as that given of the regular sale."

The court below was in error in holding that the tax deed for the north 30 feet of Lot 7 was void, unless the alleged fraud and conspiracy on the part of D. J. Ferguson and D. J. Evans are established.   We will presently consider the charge of fraud and conspiracy.

VI.   Plaintiff claims that the tax deeds executed to D. J. Evans are fraudulent and void; that there was fraud and collusion between the defendants Ferguson and Evans; that sale

<div style="margin-left:0">4. LIFE ESTATES:<br>taxes: right to<br>acquire deed.</div>

of the property for taxes levied during the life tenancy does not deprive plaintiff of her one-fourth interest in the property; that Ferguson and Evans were charged with the duty of paying the taxes accruing during the life tenancy. We agree with counsel for plaintiff that Ferguson, who purchased the life tenancy and enjoyed the rents and profits of the property for some years before the death of the life tenant, was charged with the duty of paying the taxes levied on the property. Ferguson could not have acquired a valid tax title as against plaintiff. *First Cong'. Church v. Terry,* 130 Iowa 513; *National Sur. Co. v. Walker,* 148 Iowa 157. Ferguson also agreed, in his contract of purchase, to pay for the paving around said lot, and would probably be bound thereto (the question is not before us, and we do not pass upon it) by said contract. But Evans was not a purchaser of the life tenancy, except as he purchased the certificate of tax sale for the whole lot and received a deed for the south 150 feet thereof, and afterwards purchased the north 30 feet of said lot at tax sale and received a deed therefor. It is true that Evans received a quitclaim deed from Ferguson and his wife, but that was after the expiration of the life tenancy, and after this suit was commenced. We think that Evans, who was a stranger to the property until he became assignee of the tax sale certificate, was under no obligation to protect the interest of plaintiff, a remainderman, and would not in any way be liable to plaintiff unless he conspired with Ferguson, as charged by plaintiff, to allow the property to go to tax sale and thereby fraudulently acquire plaintiff's interest in the property. Counsel for plaintiff argues that the close business relationship of Ferguson and Evans over a period of years and the transactions between them with reference to the property involved cannot be reconciled with any reasonable theory of good faith on the part of Evans and Ferguson, and that the evidence shows that Ferguson and Evans were working together with the purpose of allowing the property to go to tax sale and deprive appellee of her interest therein. Plaintiff bases her claim of fraud largely upon the testimony of Ferguson and Evans, whom she called as witnesses. D. J. Ferguson testified, in substance, to his purchase of all interests in the lot except the interest of appellee; that one Joseph

Tuffree, with whom he dealt for the property,. agreed to secure for him the entire estate in the lot, but did not succeed in procuring conveyance from plaintiff; that he lived on the property for about eight years, and paid the taxes on the property until 1910, except the paving taxes; that he was in California for several years, and that during that time Evans acquired the property through tax sale; that he let the property go on account of paving; that he could not pay for the paving, and "just simply let it go;" that he tried to have the assessments reduced, but failed; that he conveyed the property to his wife, thinking that probably she could hold the property; that he never talked with Evans about the paving assessments, and did not know that Evans had bought the tax sale certificate from the Barber Asphalt Paving Company; that he collected rents until 1911; that, after he returned from California, he moved into the house on the north end of the lot, in 1913; that he did not pay any rent until Evans got a tax deed to said property; that, when the property passed into the hands of Evans, he paid rent; that he borrowed some money through one Frank Haradon in November, 1914, which Evans secured payment of; that afterwards he borrowed $400 from Evans and paid off the loan he had made through Haradon; that there was a mortgage on his barber shop for $1,200; that he borrowed $400 more, and owed in all $1,600; that he gave Evans a bill of sale of his barber shop, and Evans paid off the incumbrance; that he paid Evans all he owed him; that the paving assessments, penalty, and interest had accumulated to such an amount that he gave up the idea of paying it, because it was more than he could invest in the property; that he and Evans had nothing to do with each other in regard to the paving assessments or tax sales; that they never talked about it; that, after the property was sold, he made no effort to redeem it, because he felt that it was more than he could invest in the property; that he had a talk with plaintiff and told her that the treasurer told him that the taxes amounted to about $1,500, and that he could not afford to pay that amount for the paving; that he offered to transfer his interest to plaintiff, if she would pay him what he had in the property; that he endeavored to make arrangements to redeem the property or buy the tax sale certificate while it was held by the Barber Asphalt Paving Com-

pany; that he tried to get the city to reduce the assessments; that he offered the city $450 in cash; that he understood that the assessment could not be over $400, as the property was assessed at $1,600; that he and Evans had no transaction regarding the property until after the notice for tax deed was served upon him; that, after Evans got his first tax deed, he occupied only the north 30 feet of the lot, and had an arrangement with Evans for the use of certain outbuildings on the south part of the property; that, after Evans got his first tax deed to the south 150 feet of the property, he, Ferguson, claimed only an interest in the north 30 feet; that he continued to occupy the north 30 feet without paying rent, until Evans got his second tax deed, to the north 30 feet, in 1915; that, after Evans got his first tax deed, Evans took the rent on the south 150 feet of the lot, and after the second tax deed, Evans received the rent on all of the lot,— that is, both houses on the lot; that he paid rent to Evans for the north house after Evans received his tax deed therefor in 1915; that there was no transaction between him and Evans in regard to the property, except paying the rent to Evans for the house that he occupied on the north end of the lot for the period following the date of the second tax deed; that there never was any arrangement of any kind between him and Evans or any other person in regard to the tax deeds and procuring title to the lot for Evans; that he did object, and tried to get the paving assessments reduced, and when he failed, and the amount got beyond his means, he simply let the property go; that Evans did nothing to prevent him from redeeming the property; that he knew that the paving company owned the certificate, but did not know anything about the transaction between Evans and the company until he was served with notice for tax deed; that he made a quitclaim deed of the lot to his wife in 1907, except a one-third interest, which he retained, and also another quitclaim deed in 1907 to his wife for all of the lot; that Evans was a notary public, and drew the deeds for him and took the acknowledgments; that he requested Evans to draw the deeds; that Evans did not suggest having the deeds made; that his object in having deeds made to his wife was that he thought the deeds would influence the Barber Asphalt Paving Company to a more reasonable settlement before the property went to sale;

that there was no talk between him and Evans of any transaction about the property, either before or at the time of making quitclaim deeds to his wife; that Evans had nothing to do with the control of the property or looking after or directing what should be done with it until after he got his first tax deed; that, after the first tax deed was issued, Evans got the rent for the south 150 feet of the lot, and he, Ferguson, occupied the north 30 feet; that, after the second tax deed, Evans received the rent for the whole lot; that Evans never paid him anything at any time in connection with the lot, and that he never paid Evans anything except rent, after Evans got his second tax deed; that Evans had nothing to do with his purchase from the Crampton family; that his indebtedness to Evans in 1914 had nothing to do with the lot, nor with getting the lot; that he gave Evans a bill of sale of his barber shop as security for the money loaned him by Evans, and that the indebtedness was afterwards paid in full; that borrowing of the money from Evans had nothing to do with Evans's getting tax deeds to the lot, and that the money was not loaned to him for any purpose connected with the tax deeds; that his negotiations with the Barber Asphalt Paving Company for reduction of the assessments were all had before Evans bought the certificate; that he had nothing to do with Evans's buying the certificate.

D. J. Evans testified that in 1910 he bought the tax certificate issued at the tax sale of December, 1907, from the Barber Asphalt Paving Company, and paid the company $1,255 in cash, and later received a deed from the treasurer; that purchase of this certificate by him was purely a business transaction of buying something; and that there was no arrangement with Ferguson concerning it.

D. J. Ferguson, witness for defendants, testified that he bought a three-fourths interest in the lot and moved on it; that there were two small old houses on the lot; that he rented the south house from 1903 to 1910, and occupied the north house himself; that he paid taxes on the property up to 1910; that he bought a three-fourths interest in the property through Joseph Tuffree, and never had any negotiations with anybody else about buying the property; that, when he bought the property, he did not know that plaintiff held a one-fourth interest in it; that

afterwards he had a talk with plaintiff about the paving assess-
ments, and told her that he had written the paving company
to see if he could get a reduction; that she said she was willing
to take $300 for her interest; that he told plaintiff that, if he ·
could get enough reduction of the paving assessment to afford
to pay her $300, he would take her interest; that he told her
that, if he could not do that, he would take what he had in the
property and turn it over to her and let her settle with the paving
company; that she said she did not have the money to do that;
that, when he bought the property, Tuffree told him that the
paving would cost only $400, that the valuation was $1,600, and
that it could not be assessed for more than one fourth of the
assessed valuation; that Evans had nothing to do with his buy-
ing the property; that he and Evans had no interests together
or business with regard to the property, except that Evans, at
his request, drew the deeds which he (Ferguson) made to his
wife; that he had nothing to do with Evans's purchase of the
tax sale certificate; that he was not interested with Evans in
buying the tax sale certificate, and had no connection with the
transaction whatever; that he let the north 30 feet go for taxes
because it was too small for a building site, and would not be
of any value to him; that he did not know that Evans was about
to get a tax deed to the north 30 feet until notice for tax deed
was served on him, in 1914; that Evans collected the rent for
him while he was in California; that Evans bid the north 30 feet
in at tax sale, while he was collecting the rents and looking after
it for him; that he made a quitclaim deed to Evans, at Evans's
request, after Evans had acquired his tax deeds; that he had no
interest in the property then, and made the deed at Evans's
request; that, when he went to California, he left Evans to look
after the property and repairs and insurance, but did not say
anything to him about the taxes.

D. J. Evans, as witness for defendants, testified that, when
he received the first tax deed, he read it, and insisted to the
treasurer that he was entitled to a deed for the whole lot, and
the treasurer told him that the south 150 feet only could be
sold for paving, and that he could give him a deed for only
that much; that later he sold the south 120 feet to Albert C.
Carlson; that, up to the time he sold to Carlson, no one ever

claimed to him to own any part of the lot; that at no time prior to the commencement of this suit was any claim made by anyone to him that they owned any part of the lot; that he had been for several years engaged in the real estate and loan business in Marshalltown; that he had never been a purchaser of property at tax sale before; that, after he got the first tax deed, and until he received the second tax deed, he rented the south house, and Ferguson occupied the north house; that Ferguson never instructed him to pay the taxes on the north 30 feet of the lot; that Ferguson told him he was not going to pay any more taxes on it; that, while Ferguson was in California, he collected about $100 rent on the north house, and made some repairs, and sent the balance to Ferguson; that, when Ferguson came back, he looked after the renting himself, until he moved into the north house; that there never was any arrangement between him and Ferguson in regard to the property's being sold, either for general or special taxes; that he never had any conversation with anyone in regard to plaintiff's interest in the property, as connected with the tax sales and tax deeds; that he still owned the north 60 feet of the lot; that he sold the south 120 feet of the lot to Albert C. Carlson; that, by doing most of the work himself, he spent about $300 in repairs on the property; that Ferguson, at the time of the trial, was occupying the north 60 feet, and was paying him rent; that he did not know about the claim of plaintiff to the property when he prepared the quit-claim deeds from Ferguson to his wife; that he drew the deeds under Ferguson's instructions, and just as he directed; that Ferguson did not tell him that he had only a three-fourths interest, and he did not know that; that, after he received the treasurer's deed for the south 150 feet, he told Ferguson of it, and Ferguson said he had made up his mind that he was not going to pay out any more on the lot; that he did not have much in it, and he was not going to pay any more; that that was shortly before Ferguson went to California; that Mr. Daley, his attorney, called his attention to the fact that the taxes on the north 30 feet had not been paid, and he attended the sale and bought the lot; that Daley was the only person he talked to with regard to buying the property; that he never knew that there was a one-fourth interest that Ferguson did not own; that he did not

know of the one fourth claimed by plaintiff, when he sold to Carlson; that, after this lawsuit was begun, he asked Ferguson for a quitclaim deed, and Ferguson said he had no interest in the property, and would make the deed, and he did; that, over a period of six or eight years, he had loaned Ferguson money at various times, and had signed notes with him; that Ferguson never talked with him about the paving nor the assessments for the paving; that he was not interested in the lot at the time he loaned money to Ferguson; that Ferguson always secured him for the money he borrowed; that, in March, 1914, he mortgaged the lot and raised $400 and loaned it to Ferguson; that, in May, Ferguson borrowed the money and paid off the mortgage.

Albert C. Carlson, called by defendants, testified that he bought the south 120 feet of the lot from Evans for $2,000, May 7, 1914; that he had expended in improvements on the property, since he bought it, $4,700; that, when he bought it, he had no knowledge that plaintiff was making any claim to the property; that, until this suit was begun, plaintiff never made any claim to the property against him.

The burden was on plaintiff to prove the alleged fraud. Upon a careful consideration of the evidence and any reasonable inferences that may be drawn therefrom, we are unable to find any support for the charge that Ferguson and Evans conspired and fraudulently acted together for the purpose of injuring plaintiff. We fail to locate in the record any testimony to support a finding that Ferguson, in connivance with Evans, permitted the property to be sold at tax sale for the paving assessments, to the end that Evans should acquire the property through tax sales. We do not think that the decree entered has sufficient support in the record.

VII. The entire lot was properly sold at the tax sale of December, 1907, and the certificate of purchase recited that the whole lot was sold. In accordance with such sale and certif-

5. REFORMATION OF INSTRU-MENTS: tax deed: mistake *in re* amount of land.

icate, Evans, who purchased the certificate of the Barber Asphalt Paving Company, was entitled to a deed for the whole lot. The execution of the deed for only the south 150 feet of said lot was a mistake. The deed should have been for the entire lot, and defendants Evans and Carlson are entitled to have the deed

reformed, covering and conveying the entire lot, as of the date of the issuance of the deed. The petition of plaintiff is dismissed. Decree may be entered in this court on application, reforming the deed to correspond with the sale and certificate of purchase, and quieting title to the north 60 feet of the lot in defendant D. J. Evans, and quieting title to the south 120 feet of said lot in defendant Albert C. Carlson.

Results in reversal on appeal of Evans and Carlson, and affirmance on appeal of Ella L. Harris.—*Reversed on appeal of defendants; affirmed on appeal of plaintiff.*

PRESTON, C. J., EVANS and FAVILLE, JJ., concur.